UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
AVGRAPHICS, INC., JEAN PIERRE AZOULAY
And DARIA MCDERMOTT,

                    Plaintiffs,

          -against-

NYSE GROUP, INC.,
(successor in interest to New York
Stock Exchange, Inc.) JOHN GREGORETTI,
TONY WALENTY, SAM COCOZZA,
MARGARET DeB. TUTWILER, JOHN THAIN,
individually and as employees of
NYSE GROUP, INC., ANTHONY E. WILSON,
a/k/a TONY WILSON,
DANA GREGORETTI, and
E-TRADE, Securities LLC

                    Defendants.
-----------------------------------------X

**FIRST AMENDED**
**COMPLAINT WITH**
**JURY DEMAND**



07 CIV 8430 H W/H

JAN 24 2008

U.S.D.C. S.D. N.Y.
CASHIERS

     Plaintiffs, AVGRAPHICS, INC., JEAN PIERRE AZOULAY and

DARIA MCDERMOTT, by and through their attorneys, the law

firm of CRONIN & BYCZEK, LLP, as and for their Complaint

against Defendants, respectfully alleges, with knowledge of

its own actions and on information and belief as to the

actions of others, and sets forth the following:


### NATURE OF ACTION


    1.   This is a civil action for monetary damages,

proximately the result of conduct engaged in by Defendants

which conduct, was predicated on causes of actions of

1

Defamation, Breach of Contract, Breach of Fiduciary Duty,
and Tortious Interference With Contract against various
Defendants as detailed herein.

## JURISDICTION AND VENUE

2.    Plaintiffs allege violations and independently the
Courts jurisdiction is invoked pursuant to 28 U.S.C. §1331
and 1332 and Diversity of Citizenship.

3.    This Court has original jurisdiction over the
subject matter of this action pursuant to 28 U.S.C. §1331,
in that certain of the Plaintiffs' claims arise under the
laws of the United States and supplemental jurisdiction over
the remainder of Plaintiffs' State Law claims in this
action, pursuant to 28 U.S.C. §1367.

4.    Venue is proper in this district under 28 U.S.C.
§1391 (b), because a substantial part of the events giving
rise to the claims occurred in this district.

5.    Personal jurisdiction is proper under 28 U.S.C.
§1332 and N.Y. CPLR §§301 and 302, because each Defendant
either resides in New York, or, in person or through an
agent, transacts or has transacted business within New York,
or contracts or has contracted to supply goods or services
within New York, or has committed a tortious act within New
York.  Each Defendant did and continues to do business
within New York, made contracts to be performed in whole or

2

in part in New York, and/or performed tortious acts
reasonably expected to have consequences in New York and in
this district while deriving substantial revenue from
interstate or international commerce.

## IDENTITY OF THE PARTIES AND BACKGROUND
## WITH RESPECT TO ALL PLAINTIFFS

6.   At all relevant times mentioned herein, Plaintiff
AVGRAPHICS is a New Jersey corporation having its principal
place of business at 11 Wall Street in the County, City and
State of New York.

7.   At all relevant times mentioned herein, Plaintiff
Jean Pierre Azoulay was a resident of the State of New
Jersey and at times a shareholder of AVGRAPHICS and at all
relevant times herein was employed by Plaintiff AVGRAPHICS a
New Jersey corporation having its principal place of
business at 11 Wall Street in the County, City and State of
New York.

8. At all relevant times mentioned herein, Plaintiff
Daria McDermott, formerly known as Daria Desiderio, was a
resident of the State of New York and at times a shareholder
of AVGRAPHICS and at all relevant times herein was employed
by Plaintiff AVGRAPHICS, a New Jersey corporation having its
principal place of business at 11 Wall Street in the County,

3

City and State of New York.

9. NYSE Group, Inc., now the owner of the entity previously known as the New York Stock Exchange, Inc., ("The NYSE"), being a Delaware corporation that maintains its principal executive offices at 11 Wall Street in the County, City and State of New York, is a holding company that, through its subsidiaries, is a leading global multi-asset financial marketplace that operates multiple securities market centers, including the New York Stock Exchange.

10. At all relevant times mentioned herein, Defendant Anthony E. Wilson a/k/a Tony Wilson was a resident of the State of New York and was employed by Plaintiff AVGRAPHICS.

11. At all relevant times mentioned herein, Defendant Dana Gregoretti was a resident of the State of New Jersey and was employed by Plaintiff AVGRAPHICS.

12. At all relevant times mentioned herein, Defendant John Gregoretti was a resident of the State of New Jersey and was employed by Defendant NYSE Group, Inc., now the owner of the entity previously known as the New York Stock Exchange, Inc., ("The NYSE"), being a Delaware corporation that maintains its principal executive offices at 11 Wall Street in the County, City and State of New York.

13. At all relevant times mentioned herein, Defendant Tony Walenty was a resident of the State of New Jersey and

4

was employed by NYSE Group, Inc., now the owner of the
entity previously known as the New York Stock Exchange,
Inc., ("The NYSE"), being a Delaware corporation that
maintains its principal executive offices at 11 Wall Street
in the County, City and State of New York.

14.  At all relevant times mentioned herein, Defendant
Sam Cocozza was a resident of the State of New York and was
employed in the Security Department by NYSE Group, Inc., now
the owner of the entity previously known as the New York
Stock Exchange, Inc., ("The NYSE"), being a Delaware
corporation that maintains its principal executive offices
at 11 Wall Street in the County, City and State of New York.

15.  At all relevant times mentioned herein, Defendant
Margaret DeB. Tutwiler was a resident of the State of New
York and was employed as Executive Vice President of
Communications by NYSE Group, Inc., now the owner of the
entity previously known as the New York Stock Exchange,
Inc., ("The NYSE"), being a Delaware corporation that
maintains its principal executive offices at 11 Wall Street
in the County, City and State of New York.

16.  At all relevant times mentioned herein, John
Thain, was the Chief Executive Officer of NYSE and has been
since January 15, 2004.  Pursuant to Article IV, Section 3,
of the NYSE Constitution, as CEO, Thain is responsible for

5

the administration and management of NYSE's affairs.  Thain
is also a member of the NYSE's Board of Directors.

17.  At all relevant times mentioned herein, E-Trade
Securities, LLC conducts trading, investing, banking and
lending and is a Delaware Corporation located at 135 East
57th Street, New York, New York 10022 with a mailing address
of P.O. Box 1542 Merrifield, Virginia  22116-1542
York.


## BACKGROUND FACTS


18.  On or about February 10, 2004,employees of the
Defendant NYSE approached Plaintiff Azoulay who was then
employed by a company known as AVHQ and solicited Azoulay
to form a corporation to replace AVHQ as the exclusive
provider of audio-visual and graphics needs to NYSE.

19. NYSE expressly agreed to fund the "start up costs"
of the new organization and agreed that the arrangement
would continue as long as Azoulay wished provided there was
no evidence of overt attempts to damage NYSE.

20. In exchange for said agreement, Plaintiff Azoulay
formed a corporation, AVGraphics, hired the AVHQ employees,
agreed to work exclusively for NYSE and to locate his office
within the NYSE building at 11 Wall Street, New York, NY.

6

21. Upon information and belief, NYSE later "bought out" the AVHQ contract including a non-solicitation clause to the satisfaction of the owners of AVHQ who released Azoulay and the other employees dedicated to the NYSE account from their non-compete employment agreement.

22. On January 1, 2005, NYSE and AVGraphics entered into a contract (hereinafter referred to as the "NYSE Agreement"). A true copy of the NYSE Agreement is annexed hereto as Exhibit "A".

23. Upon information and belief, the NYSE Agreement with plaintiff AVGRAPHICS like the agreement between AVHQ and NYSE, expressly provided for non-solicitation of AVGRAPHICS' employees at paragraph 10 of Exhibit "A" entitled, *Non-Solicitation"*, as follows: "Each Party covenants and agrees that, during the Term of this Agreement and for a period of one (1) year thereafter, it shall not solicit, recruit, hire or employ, or encourage any third party to solicit recruit, hire or employ, or assist any third party in soliciting, recruiting, hiring or employing, the Services of any of the other Party's officers or employees without prior written consent of such other Party".

24. The "NYSE Agreement" also provided a renewal Clause at paragraph 2 a) of Exhibit "A" entitled, *Initial*

7

*and Renewal Terms*, as follows:  "Subject to the provisions
of Section 11 below, the term ("Term") of this Agreement
shall be for an initial period of one (1) year ("Initial
Term") and may be extended for subsequent periods of one (1)
year (each year a "Renewal Term") on the mutual written
consent of the parties".

25.  The NYSE Agreement provided for cancellation of
the Agreement only under certain circumstances and required
NYSE to provide notice of cancellation at paragraph 11 of
Exhibit "A", entitled, *"Termination"*.

26. From January 1, 2005 until December 20, 2006,
Plaintiffs performed all their obligations under the NYSE
Agreement.

27. On or about January 1, 2005, Defendant NYSE
arranged for its employee, Defendant Walenty, to act as
liaison between NYSE and AVGRAPHICS.

28.  On or about January 1, 2005, AVGRAPHICS hired
Anthony Wilson as an audiovisual engineer.

29.  On or about January 1, 2005 at the
request of Defendant NYSE employee, John Gregoretti,
AVGRAPHICS hired his daughter Defendant Dana Gregoretti.

30. On or about January 15, 2005, Anthony Wilson
obtained Plaintiff Azoulay's computer password under false

8

pretenses claiming he needed it for the purposes of managing the AVGRAPHICS' participation in "Fantasy Football".

31. On or before April 20, 2005, upon information and belief, Defendant Anthony Wilson and Defendant Dana Gregoretti became involved in a romantic relationship.

32. On April 20, 2005 without the knowledge or consent of Plaintiff Azoulay, Defendant Wilson and/or Defendant Dana Gregoretti, used plaintiff Azoulay's computer password to gain access to Plaintiff Azoulay's E-trade account and pretending to be Azoulay made a fraudulent purchase of 35 shares of stock in Archipelago at a purchase price for each share of $16.80. Archipelago was a company that would announce its proposed merger with NYSE on April 21, 2005.

33. The fraudulent purchase of the Archipelago stock upon information and belief by Defendants Wilson and/or Dana Gregoretti was done by electronic means involving and effecting interstate commerce and Securities and Exchange Commission regulations.

34. Defendants Wilson and /or Dana Gregoretti intended to and did expose Azoulay to a false claim of insider trading by making it appear that Azoulay had violated NYSE Rules and Regulations and those of the SEC by utilizing what was then still confidential information for personal gain in order to obtain control of AVGraphics' business and/or the

9

contract with NYSE.

35. Once the merger was public knowledge, on April 21, 2005, and the price per share $32.00, plaintiff Azoulay himself purchased 200 shares of Archipelago. At that time, Azoulay was not aware of the 35 shares that had been purchased the day before.

36. The Archipelago stock was never traded and is owned by Plaintiff Azoulay to this date.

37. On or about September 20, 2005, Plaintiff Azoulay terminated Wilson's employment as Wilson had exhibited violent behavior. Azoulay requested a guard from NYSE Security Management, Defendant Sam Cocozza, and requested that NYSE liaison, Defendant Walenty be present. Defendant Walenty and a security guard were present outside the door of AVGraphics.

38. Defendant Wilson extorted and threatened to falsely reveal to authorities that Plaintiff Azoulay had made an "illegal trade" with respect to the "insider" information AVGRAPHICS management employees had been given with respect to the merger between NYSE and Archipelago. Knowing that the only trades Azoulay had made for Archipelago stock were after the merger, Azoulay was outraged and immediately demanded Defendant Wilson leave his office.

39.   Defendant Wilson went further and attempted to bribe and extort money from Azoulay by suggesting that Azoulay pay him and his girlfriend, Dana Gregoretti, money not to go to the authorities, namely John Gregoretti, NYSE's Regulation liaison with the Securities and Exchange Commission, hereinafter "SEC". When Azoulay rebuffed the threat, Defendant Wilson got loud and violent.  Defendant Wilson was escorted out of the NYSE building followed shortly thereafter by Defendant Dana Gregoretti.

40. Defendant Walenty knew of Defendant Wilson's attempt to bribe and extort money from Azoulay and AVGRAPHICS.

41.  Plaintiff Azoulay told Walenty he intended to go directly to the SEC and police.  At Walenty's suggestion, he directed Azoulay instead to meet with NYSE's head of security, Defendant Sam Cocozza.

42.  After hearing all the facts, Defendant Cocozza strongly suggested if not directed Azoulay not to go to the police.

43.  Within a day or two, Azoulay feeling outraged, threatened and uncertain of the direction by Cocozza and Walenty not to involve the authorities, he sought the guidance of NYSE high-level executive Mike Cohen, who also told Azoulay not to go to the authorities and not to worry

about his relationship with NYSE.

44. Plaintiff Azoulay in reliance on the guidance of these NYSE employees took no further action against Defendants Anthony E. Wilson and Dana Gregoretti.

45. Upon information and belief, NYSE Regulations Director, John Gregoretti, was aware of the conversations between plaintiff Azoulay and NYSE employees Walenty, Cocozza and Cohen and of the allegations regarding the activities of Anthony Wilson and Dana Gregoretti regarding the unauthorized trade on Plaintiff Azoulay's account, but took no action to investigate the activities of his daughter and her boyfriend or report them to the authorities.

46. On or about October 2006, Azoulay was approached by Walenty and Neil Courtney, Counsel to NYSE concerning the extension of the AVGRAPHICS/NYSE Agreement for 2007. As the agreement identifies the expectation of the parties that the agreement would be extended with a 20% increase in overall cost, as they had in the past year, the parties agreed to the extension of the agreement with that cost increase. In reliance on the agreement, AVGRAPHICS continued its employment contracts with its employees adjusting costs and disbursements consistent with the agreed upon extension and increase.

47. On December 14, 2006, Azoulay was summoned by NYSE

Human Resources to report to the Executive Offices.   Present
at the meeting were Defendant Walenty, NYSE Counsel, Neil
Courtney, Diane Moreno from Human Relations and Louise Quick
from Ethics.  Azoulay was told that NYSE knew of an
"illegal" trade in violation of the agreement between
Azoulay and NYSE and that effective immediately Azoulay
would not be permitted to enter the AVGRAPHICS offices
located within the NYSE building at 11 Wall Street, New
York, NY.  Azoulay protested that he had done nothing wrong
and NYSE insisted that they had proof positive from his E-
Trade account that a trade had been made to purchase
Achipelago stock prior to the official announcement of the
merger between NYSE and Archipelago.  NYSE stripped Azoulay
of his NYSE credentials and Identification Card and escorted
him out of the building.

      48.  On or before December 2006,upon information and
belief, Defendants NYSE, JOHN GREGORETTI,TONY WALENTY and
SAM COCOZZA,  improperly  requested  information from E-
Trade regarding portions of Plaintiff Azoulay's account
history by misrepresenting the purpose of their inquiry
and/or under color of legal authority.

      49. On or before December 2006, Defendants NYSE, JOHN
GREGORETTI, TONY WALENTY and SAM COCOZZA, improperly
obtained portions of Plaintiff Azoulay's E-trade account

                              13

history.

50. On or before December 2006, Defendant E-Trade improperly provided portions of confidential customer information to Defendants NYSE, JOHN GREGORETTI, TONY WALENTY and SAM COCOZZA, regarding Plaintiff Azoulay.

51. On or before December 2006, Defendant E-Trade violated its fiduciary duty to Azoulay and released portions of his confidential information to NYSE and others without Azoulay's permission or consent, all to the economic detriment of Azoulay and AVGRAPHICS.

52. On or before December 2006, Defendant E-trade violated its privacy policy and released portions of confidential information it maintained regarding Plaintiff Azoulay to NYSE without his consent.

53. On December 14, 2006, NYSE improperly and illegally confiscated the personal computer from Azoulay's desk, informed the AVGRAPHICS' employees that Azoulay was "out" and demanded AVGRAPHICS' books and records from AVGRAPHICS' Administrative Director, Daria McDermott, along with all employment files for all employees.

54. NYSE also instructed all AVGRAPHICS' employees to continue working on NYSE projects and assured all employees that they would hire them as NYSE employees.

55. In the days that followed the December 14, 2006

meeting, NYSE negotiated with AVGRAPHICS with the deliberate misrepresentation that they intended to extend the AVGRAPHICS' agreement as originally planned. However, on or about December 31, 2006 on the eve of the expiration of the agreement, NYSE demanded that Azoulay give up all ownership in AVGRAPHICS and that AVGRAPHICS continue to work exclusively for NYSE without the contractual increase and on a month-to-month basis.

56. In order to secure an "interim agreement" with NYSE, a true copy of which is furnished herewith as Exhibit "B", and to continue the operation of AVGraphics, some economic stability, and as a condition precedent to the "interim agreement", Azoulay was required by NYSE to turn over all ownership in AVGRAPHICS to Plaintiff Daria McDermott.

57. AVGraphics and its employees as well as Daria McDermott were forced to work extra hours without compensation.

58. Defendants Wilson and Dana Gregoretti evidenced their conspiracy by sending repeated e-mails to AVGRAPHICS' employees in which they revel in their intention and ability to destroy AVGRAPHICS and Azoulay.

59. Upon information and belief the NYSE defendants continued to defame Azoulay and disparage AVGRAPHICS by

15

publishing the untruths concerning the aforementioned "insider trade" to the employees of AVGraphics and of NYSE despite their knowledge of the falsity of these allegations, irreparably damaging the professional and personal reputation of the Plaintiff Azoulay and the business reputation of AVGraphics.

60. Upon information and belief, NYSE repeatedly solicited AVGRAPHICS' employees in violation of the agreement.

61. Further NYSE made repeated promises to the new owner of AVGRAPHICS, Plaintiff Daria McDermott, to the effect that NYSE would continue the interim monthly agreement with her, provided she continued to work exclusively for NYSE at the old agreement rate of pay. All to the economic detriment of AVGRAPHICS.

62. Further, NYSE entered into negotiations with Azoulay to reconsider their expulsion of him if he could prove that the "illegal insider trade" was not made by him. Azoulay, to his economic detriment, hired attorneys and private investigators to prove that he had not made the trade. Azoulay proved that the trade was made when Azoulay was not in the building yet Defendant Wilson was, that Azoulay had never made any insider trades that Azoulay had exposed the attempts to extort and bribe him immediately to

Security and to upper management who directed him not to file a criminal complaint. Azoulay spent untold hours attempting to prove his innocence all to the detriment of his ability to earn an income all based on the fraudulent misrepresentations by NYSE and in reliance on their promises that they would fairly reassess the expulsion and annul extension of the AVGRAPHICS agreement at the agreed upon increased rate of pay.

63. When NYSE was provided evidence concerning the illegal activities of Defendants Dana Gregoretti and Anthony Wilson, a termination letter was issued by NYSE.

64. In violation of the "Agreement", the termination notice did not fulfill any of the contractual requirements. Pursuant to said clause contained in the Agreement, specifically, no reason for termination or an opportunity to cure were given.

65. NYSE employees again made formal offers of employment to AVGRAPHICS' employees in violation of the Agreement and in furtherance of their attempt to obtain the AVGRAPHICS' company.

17

## FIRST CLAIM FOR RELIEF AGAINST
## DEFENDANT NYSE FOR BREACH OF CONTRACT

66. AVGRAPHICS repeats and realleges the allegations contained in paragraphs "1" through "65" hereof as if fully set forth herein

67. By its conduct described above, NYSE breached its agreement with AVGraphics including but not limited to a breach of the covenant of good faith and fair dealing, and the Non-Solicitation and Termination provisions of paragraphs 10 and 11 of the agreement here as Exhibit "A".

68. By reason of the foregoing , AVGRAPHICS has been damaged in an amount to be determined at trial but in no event less than One Million Dollars ($1,000,000.00), together with interest thereon.

## SECOND CLAIM FOR RELIEF AGAINST
## DEFENDANTS NYSE, WALENTY, TUTWILER
## FOR TORTIOUS INTERFERENCE WITH CONTRACT

69. Plaintiffs repeat and realleges the allegations contained in paragraphs "1" through "68" hereof as if fully set forth herein.

70. At all relevant times, defendants were fully aware of AVGRAPHICS employees' contractual obligations to

18

AVGRAPHICS including their duty to act in the best interest of AVGRAPHICS and avoid conflicts of interests and self-dealing.

71. Defendants knowingly interfered with AVGRAPHICS employees' contractual obligations to AVGRAPHICS. The interference with AVGRAPHICS employees' contract with AVGRAPHICS by defendants was wrongful, unlawful, without justification, and was done to cause injury and damage to AVGRAPHICS.

72. As a result of the interference with its contract with AVGRAPHICS' employees, AVGRAPHICS has been damaged in an amount to be determined at trial, but in no event less than Ten Million Dollars ($10,000,000.00), together with punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS NYSE, JOHN GREGORETTI, WALENTY, COCOZZA, TUTWILER AND THAIN FOR CONVERSION

73. Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "72" as though fully set forth herein.

74. Azoulay is the owner of AVGRAPHICS, property, software, hardware, trade secrets, goodwill and assets associated with them.

75. Defendants intentionally interfered with Azoulay's

ownership and possessory rights to AVGRAPHICS' property, goodwill and assets associated with them.

76. Defendants wrongfully claimed and/or obtained possession of the Plaintiffs' IMAC computer belonging to Plaintiffs containing all the software, trade secrets, and the goodwill associated with AVGRAPHICS.

77. Defendants wrongfully obtained Azoulay's purported ownership of AVGRAPHICS and all the inner workings of AVGRAPHICS.

78. On or about December 31, 2006, Azoulay and McDermott made a demand to the Defendants to return AVGRAPHICS' property. The Defendants failed to return the property to Plaintiffs.

79. Defendants' acts were done maliciously and deliberately with knowledge of Plaintiffs' rights and with intent to interfere with those rights, warranting punitive damages at the amount to be determined at trial.

80. As a result of the interference with Plaintiffs' ownership to AVGRAPHICS' property and assets, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than Ten Million Dollars ($10,000,000.00), together with punitive damages in an amount to be determined at trial.

20

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT
## E-TRADE BREACH OF FIDUCIARY DUTY

81.   Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "80" as though fully set forth herein.

82.   Defendant "E-Trade Financial" offers the service of trading securities products to its account holders and "acts as a custodian for funds and securities deposited with it".

83.   Defendant "E-Trade Financial" had fiduciary obligations to Plaintiff J.P. Azoulay.  Further, Plaintiff reposed confidence in E-Trade and reasonably relied on this confidentiality.  As a result of Defendant E-Trade's fiduciary obligations to Plaintiff Azoulay, E-Trade was required to exercise duties of loyalty, due care and good faith.  Encompassed within those duties is the duty to act to further the best interests of those account holders who rely on that fiduciary duty.

84.   In direct violation of their fiduciary obligation, Defendant E-Trade reported information to co-Defendant NYSE without permission from the account holder, Azoulay.

85. As a direct and proximate result of the breach of fiduciary duty Plaintiff has suffered loss of the benefit of

21

the AVGraphics/NYSE agreement, damages to its reputation and the loss of current and future earning potential.

### FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS, NYSE, JOHN GREGORETTI, WALENTY, COCOZZA, TUTWILER AND THAIN INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

86.  Defendants were aware of the Non-Solicitation and Termination clauses in the AVGraphics/NYSE agreement.

87.  Defendants solicited all of Plaintiff AVGraphics' employees in violation of the Non-Solicitation clause.

88.  Defendants intentionally and maliciously interfered with the employment relationship of Plaintiffs' corporation and its employees for the purpose of forcing AVGraphics to breach its agreement with NYSE.

89. As a direct and proximate result of the intentional interference with the AVGraphics/employee's employment agreements, Plaintiff has suffered loss of benefit of the AVGraphics/NYSE agreement, damage to its reputation and the loss of future earning potential.

90.  As a result of the intentional interference with the employment contracts between Avgraphics and its employees Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than Ten Million Dollars ($10,000,000.00), together with punitive damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS, NYSE, JOHN GREGORETTI, WALENTY, COCOZZA, TUTWILER AND THAIN BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

91.    The AVGraphics/NYSE agreement contained an implied in law covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the benefits of such contract.

92.    In terminating the contract in bad faith, without good cause, upon a pretext, in violation of public policy, all for the purpose of frustrating Plaintiffs' discovery and investigation of the Defendants' participation in and/or benefit from the fraud, theft and bribery and extortion, Defendants breached this covenant of good faith and fair dealing.

93.    As a result of the intentional interference with the employment contracts between Avgraphics and its employees Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than Ten Million Dollars ($10,000,000.00), together with punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF AGAINST
## DEFENDANTS FOR DEFAMATION

94.  Plaintiffs repeat and reiterate the allegations set forth in paragraphs "1" through "93" inclusive of this complaint, with the same force and effect as though fully set forth herein.

95.  Upon information and belief, Defendants Wilson and Gregoretti falsely reported to NYSE as well as others that the Plaintiffs had committed insider-trading violations.

96.  Defendants Wilson and Gregoretti knew their statements to be false and made these statements with the knowledge and intention that these statements would damage the Plaintiff's character and professional reputation and cause Plaintiffs to lose their contract with NYSE causing severe damage.

97.  Upon information and belief, Defendants made these false allegations in order to have the Plaintiff removed from his position as Avgraphics Vendor with Defendant NYSE in order to be placed into such a position themselves.

98.  After the illegal and improper termination of Plaintiffs by Defendants, Defendants NYSE and its

24

representatives, agents and/or employees published and communicated false claims of insider trading by Plaintiff, Azoulay and the future of Avgraphics.

99.  Upon information and belief, throughout the Defendant NYSE community, staff members were told by their principals about the alleged unprofessional and criminal conduct of Azoulay and Avgraphics.  These discussions and references were about and concerning the Plaintiffs.

100. The Defendants made these statements with the knowledge and intent to defame the Plaintiffs Azoulay and AVGraphics.

101. These statements and others exposed the Plaintiffs, Azoulay and Avgraphics to public hatred, contempt, ridicule and disgrace.

102. As a result of Defendants' breach, Plaintiff suffered and is entitled to damages sustained to date and continuing in excess of the amount of Five Million ($5,000,000.00) Dollars, as well as punitive damages, costs and attorneys fees.

**JURY DEMAND**

The Plaintiffs hereby demand a trial by jury.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants as follows:

A.    For the First Cause of action for both compensatory and punitive damages in an award to be determined at a trial of this matter;

B. For the Second Cause of action against Defendants NYSE Group, Inc., Walenty, and Tutwiler in the sum of Ten Million ($10,000,000) Dollars in compensatory damages and the further and additional sum of Ten Million ($10,000,000) Dollars in punitive damages for a total of Twenty Million ($20,000,000) Dollars in the Second Cause of Action;

C.    For the Third Cause of action against Defendants, NYSE, John Gregoretti, Walenty, Cocozza, Thain and Tutwiler in the sum of Ten Million ($10,000,000) Dollars in compensatory damages and the further and additional sum of Ten Million ($10,000,000) Dollars in punitive damages for a total of Twenty Million ($20,000,000) Dollars in the Third Cause of Action;

D.    For the Fourth Cause of Action against E-Trade for both compensatory and punitive damages in an award to be determined at a trial of this matter;

E.    For the Fifth Cause of Action against Defendants in the sum of Ten Million ($10,000,000) Dollars in compensatory damages and the further and additional sum of Ten Million ($10,000,000) Dollars in punitive damages for a total of Twenty Million ($20,000,000) Dollars in the Fifth Cause of Action;

F.    For the Sixth Cause of Action against Defendants, NYSE, John Gregoretti, Walenty, Cocozza, Tutwiler and Thain in the sum of Ten Million ($10,000,000) Dollars in compensatory damages and the further and additional sum of Ten Million ($10,000,000) Dollars in punitive damages for a total of Twenty Million ($20,000,000) Dollars in the Sixth Cause of Action;

G.    For the Seventh Cause of Action against all Defendants, in the sum of Five Million ($5,000,000) Dollars in compensatory damages and the further and additional sum of Five Million ($5,000,000) Dollars in punitive damages for a total of Ten Million ($10,000,000) Dollars in the Seventh Cause of Action;

H.    In all causes of action, reasonable attorney's fees as is permitted under the law, pre-judgment interest, the costs of this action and for such other relief as this

Court may deem just and proper.

Cronin & Byczek LLP
Attorneys for Plaintiffs


BY: _Rocco G. Avallone_
Linda M. Cronin (LC0766)
Rocco G. Avallone(RA8055)
1983 Marcus Avenue
Suite C-120
Lake Success, NY  11042
516-358-1700

28

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
AVGRAPHICS, INC., JEAN PIERRE AZOULAY
And DARIA MCDERMOTT,

                    Plaintiffs,


            -against-

NYSE GROUP, INC.,
(successor in interest to New York
Stock Exchange, Inc.) JOHN GREGORETTI,
TONY WALENTY, SAM COCOZZA,
MARGARET DeB. TUTWILER, JOHN THAIN,
individually and as employees of
NYSE GROUP, INC.,ANTHONY E. WILSON,
 a/k/a TONY WILSON,
DANA GREGORETTI, and
E-TRADE, Securities LLC

                    Defendants.
---------------------------------------X
```

**Rule 7.1
Statement**

Pursuant to Federal Rule of Civil Procedure 7.1 (formerly Local General Rule 1.9) and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for AVGRAPHICS, INC., (a private non-governmental party) certifies that there are no parent corporations nor any publicly held corporation that owns 10% or more of its stock.

Date:  January 24, 2008

*Rocco G. Avallone*

Rocco G. Avallone (RA8055)
Linda M. Cronin (LC0766)

1

**EXHIBIT A**

# AUDIO VISUAL and GRAPHICS SERVICES AGREEMENT

This Audio Visual and Graphics Services Agreement ("Agreement') entered into as of the first (1st) day of January, 2005, defines the scope of services to be provided by AVGraphics, Inc. (herein, collectively "AVGraphics") with a place of business at 16 Alpine Court, Lafayette, NJ to New York Stock Exchange, Inc. ("NYSE") with a place of business at 11 Wall Street, New York, NY 10005, as well as the compensation to be paid by NYSE to AVGraphics in consideration of such services.

WHEREAS, AVGraphics desires to provide comprehensive on/off site audiovisual support and distinctively unique graphic support services to NYSE, and NYSE desires to engage AVGraphics to provide such services to NYSE on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. *Services*.

   a) *Services*. NYSE hereby engages AVGraphics to provide of the Services described in the Statement of Work ("SOW") and its Schedules attached hereto, and AVGraphics accepts such engagement.

   b) *Client Services*. AVGraphics may provide such audiovisual and graphic Services to NYSE Clients (*i.e.*, NYSE Member Organizations and NYSE Listed Companies) as AVGraphics and such Clients may agree. AVGraphics may use the On-Site Office and Storage Room (as such terms are defined in Section 4 below) in connection with providing Services to the Clients. NYSE shall use reasonable efforts to (i) direct all inquiries and orders received for the Services by the Clients to the AVGraphics employees located at NYSE; (ii) cooperate with and provide the opportunity to meet with Clients to discuss their requirements for Services; and (iii) cooperate with AVGraphics' effort to assist such Clients. Unless otherwise agreed by NYSE, as between Services performed for NYSE and Services performed for any NYSE Clients. AVGraphics shall at all times afford first priority to the performance of Services for NYSE.

   c) *NYSE Systems*. NYSE "Systems" includes amplifiers, in-ceiling speakers and other built-in audio visual related systems installed in NYSE premises. AVGraphics shall bring to the attention of NYSE when repairs to, or replacements of the "Systems," are necessary. However, AVGraphics shall have no responsibility for the maintenance, repair or replacement of such Systems or the costs of such maintenance, repair or replacement.

d) *Maintenance and Custody of NYSE Equipment*.  At AVGraphics' expense, AVGraphics shall store, and maintain all NYSE-owned or leased Equipment used by AVGraphics ("Equipment") (including NYSE owned inventory used by AVGraphics) in good working order, utilizing a preventative maintenance program and asset utilization tracking system. AVGraphics will store the Equipment on NYSE premises.

2. *Term*.

a) *Initial and Renewal Terms*.  Subject to the provisions of Section 11 below, the term ("Term") of this Agreement shall be for an initial period of one (1) year ("Initial Term") and may be extended for subsequent periods of one (1) year (each year a "Renewal Term") on the mutual written consent of the parties.

b) *Post Termination Assistance*.  In the event that AVGraphics shall notify NYSE that it elects not to enter into any Renewal Term, NYSE may, within thirty (30) days of its receipt of such notice, notify AVGraphics that it elects to extend this Agreement for a period not to exceed ninety (90) days from the later of the date of such notice or the date this Agreement would otherwise have terminated pursuant to Section 2(a) above (such period, the "Assistance Period"). The Parties' mutual obligations during the Assistance Period shall be as set forth in this Agreement except that the Management Fee described below shall be prorated for the number of actual days in the Assistance Period.

3. *Payments and Prices*.

a) *Retainer*.  NYSE shall pay to AVGraphics a retainer in the amount of $120,000 ("Retainer") due upon execution of this Agreement to be applied to the monthly invoices defined in Section 3(e) of this Agreement until the said Retainer is depleted carrying a balance of $0.

b) *Services Charges*.  AVGraphics' charges for Audio Visual, Graphics and related Services ("Service Charges") are described in Schedule A of the SOW.  From time to time, but no more frequently than annually, the Parties hereto shall negotiate in good faith to adjust the Service Charges set forth in the SOW in accordance with the then going market rate for services of the type provided for herein.  Charges for any special projects outside the scope of the SOW shall be as the parties may mutually agree in writing.  Overtime, holidays, nights, and weekend hours incurred shall be charged at a premium rate as further defined in Schedule A to the SOW.

c) *Management Fee*.  In accordance with Section 3(e) below, NYSE shall pay to AVGraphics a monthly Management Fee in the amount of $15,000 for the Management and Desk Support Services described in the SOW ("Management Fee").

d) *Outsourced Services*. Should additional staff be required above and beyond that provided for in Section 5 (b) of this Agreement, the Director of AVGraphics shall first seek the approval of the designated NYSE Manager. AVGraphics may provide additional AVGraphics employees to provide such services at the rates provided in the SOW. In the event such employees are unavailable, AVGraphics may, with NYSE's prior written consent, obtain independent contractors to provide such services ("Outsourced Services") Any Outsourced Services procured by AVGraphics on behalf of NYSE will be billed to NYSE at cost plus a 15% margin.

e) *Invoicing*. AVGraphics shall invoice NYSE directly on a monthly basis for the Management Fee and Service Charges. All invoices will provide details on all activity and tasks performed by AVGraphics. NYSE agrees to pay a finance charge of one and one-half percent (1.5%) per month on payments not remitted to AVGraphics within forty-five (45) days from the date of NYSE's receipt of the invoice. AVGraphics shall not invoice NYSE for, and NYSE shall bear no responsibility for, any Services provided to any NYSE Client. AVGraphics shall make separate billing arrangements with any Clients to whom it may provide Services.

f) *Tracking and Reporting*. AVGraphics shall track and report all Services rendered to NYSE to the individuals specified by NYSE, in a monthly report to be in the form requested by NYSE.

4. *AVGraphics Facilities*.

a) *On-Site Office*. Subject to Section 4(e), at no cost to AVGraphics, NYSE shall permit AVGraphics to occupy, during the term of this Agreement, an office ("On-Site Office") on NYSE owned or leased premises, of a size and at a location reasonably acceptable to AVGraphics from which office AVGraphics shall provide the Services contemplated hereby. AVGraphics agrees that the office located at 11 Wall Street, 9th Floor, is acceptable.

b) *Telephone and E-mail Service*. At no cost to AVGraphics, NYSE shall provide the On-Site Office with an in-house telephone extension accessible through the NYSE's telephone switchboard, and access to NYSE's internal e-mail system. The foregoing notwithstanding, AVGraphics shall be responsible for the cost of all telephone calls to telephone numbers other than NYSE extensions, made from said extension.

c) *Storage Room*. Subject to Section 4(e), at no cost to AVGraphics, NYSE shall exclusively permit AVGraphics to occupy a storage room ("Storage Room") with sufficient space for AVGraphics to store Equipment. NYSE shall locate the Storage Room in reasonably close proximity to NYSE's meeting facilities. AVGraphics agrees that the space located at 11 Wall Street, 9th Floor, is acceptable.

d) *Security and Damage.* AVGraphics shall be responsible for the security of its equipment and property located in the On-Site Office and the Storage Room and shall bear the risk of loss for any equipment or property contained therein. AVGraphics shall maintain the premises occupied by it in substantially similar order and condition as such On-Site Office and Storage Room were prior to AVGraphics' occupancy, normal wear and tear excepted, and shall be responsible for any damage to such premises caused by the negligence of AVGraphics, its employees or agents occurring during the term of its occupancy thereof.

e) *Relocation.* At any time during the Term of this Agreement, NYSE may, in its sole discretion and at its expense, relocate the On-Site Office and/or the Storage Room to any comparable space on NYSE owned or leased premises.

f) *Rights of Occupancy.* Notwithstanding anything contained in this Section 4 to the contrary, AVGraphics shall not have any rights of occupancy to either the On-Site Office or the Storage Room.

g) *Improvements.* AVGraphics shall make no changes to the On-Site Office, the Storage Room, or any other NYSE premises occupied by AVGraphics without the prior written consent of NYSE, which may be granted or withheld in NYSE's sole and absolute discretion. In the event NYSE should grant such permission, AVGraphics may, at AVGraphics' expense make alterations and improvements to the interior of such premises, provided they are non-structural, do not affect utility service, plumbing or electrical lines, and are performed by contractors first approved in writing by NYSE. Before making any such alterations or improvements, AVGraphics shall obtain and deliver to NYSE all permits, approvals or certificates required by any governmental or other authority, and shall obtain and deliver to NYSE written unconditional waivers of mechanic's liens on the real property being improved or altered. All such improvements shall become the property of NYSE, and shall be surrendered at the time AVGraphics vacates such premises, unless NYSE notifies AVGraphics that NYSE elects to have such improvements removed, in which event AVGraphics shall remove such improvements at its expense, and shall restore the premises to their condition prior to AVGraphics' occupancy thereof. Nothing in this section shall be construed so as to prevent AVGraphics from removing any of its personal property from such premises, provided however, AVGraphics shall at its expense repair any damage to any NYSE owned or leased premises (including common areas) caused by such removal.

5. *AVGraphics Personnel.*

a) *Management and Oversight.* AVGraphics' Audio Visual and Graphic Services Director ("Director") shall coordinate all company activities and Services on behalf of NYSE and its clients. The Director will also serve as Vice President of AVGraphics, Inc. with the full authority to make immediate decisions and

commitments on behalf of the business, for the benefit of NYSE, its clients, and the AVGraphics team. The Director will be knowledgeable in the operation and maintenance of systems and processes in use throughout NYSE's facilities, and will direct support Services necessary to accommodate maintenance Services, repairs, system/technology changes and modifications, asset management and temporary technology solutions, graphic design, electronic media, and print media, as outlined in this document and its attachments. The Director will ensure the staffing necessary within the New York Stock Exchange, Wall Street, New York facility from 7:30am Monday-Friday, and will be present on-site until 4:30pm each day, to facilitate all staff and client calls for audio visual, graphics, and support Services.

b) *Services Personnel*. AVGraphics shall provide a staff of from five (5) to seven (7) individuals to assist the Director and who shall be assigned to the On-Site Office. AVGraphics may from time to time supplement the staff (i) with additional technicians and or graphic service staff, and (ii) subject to the provisions of Section 3 (d), with independent contractors.

c) *Audio Visual Services Personnel*. AVGraphics will assign a team of experienced and certified audiovisual service technicians, under the guidance of the Director of AVGraphics to coordinate all NYSE activities and Services on behalf of NYSE and its clients. The team will be knowledgeable in the operation and maintenance of systems and processes in use throughout NYSE facilities, and will direct support Services necessary to accommodate maintenance Services, repairs, system/technology changes and modifications, asset management and temporary technology solutions, as outlined in this Agreement and its attachments. The team will operate within NYSE from 7:00am Monday-Friday, and will be present on-site until 6:00pm each day, to take all NYSE staff and clients calls for audiovisual support Services.

d) *Graphics Services Personnel*.  AVGraphics will provide graphic design Services with on-site design specialists to consult with NYSE staff on the design and production of NYSE sanctioned electronic and print media, under the guidance of the Director of AVGraphics. The team will support opening and closing bell activities and graphic Services in support of visiting NYSE clients. The team will operate within NYSE from 7:00am Monday-Friday, and will be present on-site until 6:00pm each day, to take all NYSE staff and clients calls for graphics design and support Services. The AVGraphics team will support corporate identity programs, trade shows, print materials for meetings and events, advertising, and weekly news bulletins on behalf of NYSE.

e) *Conduct, Attire, and Identification*. While on the premises of NYSE or while working with the clients of NYSE, AVGraphics employees shall conduct themselves in a manner consistent with the standards, quality, and image reasonably required of employees of NYSE.  All AVGraphics employees and independent contractors performing services on NYSE premises shall wear and

maintain professional attire or uniforms compatible with the attire required for employees of NYSE and reasonably approved by NYSE management. AVGraphics and its employees and independent contractors shall comply with all reasonable rules and regulations as may be established from time to time with respect to conduct on NYSE facilities including, but not limited to, badges, passes, access, and meals.

f) *Business Conduct and Ethics.*  AVGraphics and its employees and independent contractors shall comply with the terms and conditions of the "Statement of Business Conduct and Ethics for Non-NYSE Personnel" set forth in Exhibit A as such policy may be updated by NYSE from time to time. AVGraphics agrees to cause each (i) employee of AVGraphics, (ii) permitted subcontractor and (iii) permitted subcontractor employee, who performs services under, or has access to information relating to, this Agreement, to complete, execute and deliver to NYSE a form of "Representation Warranty and Agreement" in substantially the respective form attached to this Agreement, as Exhibit B, C or D, as applicable ("Representation Warranty and Agreement"), unless such person or entity has already so executed and delivered an applicable and currently effective Representation Warranty and Agreement. Upon NYSE's request, and at its cost, AVGraphics and its employees shall attend seminars held by Customer in respect of this policy and submit to fingerprinting. In the event that any AVGraphics employee fails to comply with the terms and conditions of the policy set forth in Exhibit A, AVGraphics shall, upon NYSE's request, remove such individual from providing services to NYSE and NYSE may terminate any SOW or this Agreement, upon notice.

g) *No Benefits.* No employee or subcontractor of AVGraphics shall be eligible for any benefits or any compensation from NYSE. The foregoing notwithstanding, NYSE shall permit AVGraphics employees assigned to the On-Site Office to use NYSE cafeteria facilities available to NYSE employees generally.

h) *AVGraphics Responsibility.*  AVGraphics shall be solely responsible for the selection, hiring, compensation, benefits, supervision, discipline and dismissal of all AVGraphics employees performing Services under this Agreement. The foregoing notwithstanding, because such employees may have access to sensitive nonpublic information of NYSE, its Clients and/or its listed companies, all AVGraphics employees must be reasonably acceptable to NYSE.

i) *Compliance with Law.* AVGraphics shall comply with all applicable state, federal and local laws, and regulations regarding the employment of its employees, including but not limited to laws regarding tax and other withholding, immigration compliance and unlawful discrimination.

6. *Risk of Loss; Insurance.*

AVGraphics bears all risk of loss with respect to the Equipment and other personal property located in the On-Site Office and Storage Room. At all times during the Term, AVGraphics shall carry and maintain in full force and effect, at its sole expense, the insurance policies listed below. AVGraphics shall provide NYSE with certificate(s) of insurance evidencing the policies listed below prior to the commencing any activities on NYSE's premises in connection with this Agreement naming NYSE as an additional insured as its interest may appear for the insurance described in clauses (i) and (ii) below:

   i. Comprehensive General Liability insurance in an amount of $5,000,000 per occurrence including the following coverage: contractual liability, premises operations, personal injury, broad form property damage and independent contractors;

   ii. Workers' Compensation insurance in accordance with the provisions of the Workers' Compensation Act in the State of New York or any other state where its employees, subcontractors or independent contractors are engaged in the activities pursuant to the Agreement; and

   iii. Business Automobile coverage form insurance on all vehicles used in connection with this Agreement, if any, in an amount of $5,000,000 combined single limits for bodily injury and property damage per occurrence.

7. *Indemnification.*

   a) *By AVGraphics*. AVGraphics shall defend, indemnify and hold harmless NYSE and its respective officers, directors, agents, Clients and employees from and against any and all actions, claims, losses, expenses and/or damages, including attorney's fees, arising out of or relating to death or personal injury and/or damage to real or personal property resulting from the negligent or willfully wrongful act or omission of AVGraphics or any of its employees hereunder, except where such death, personal injury and/or damage is caused by the negligence or willful misconduct of NYSE or any of its employees or agents.

   b) *By NYSE*. NYSE shall defend, indemnify and hold harmless AVGraphics and its respective officers, directors, agents, owners and employees from and against any and all actions, claims, losses, expenses and/or damages, including attorney's fees, arising out of or relating to personal injury and/or damage to real or personal property resulting from the negligent or willfully wrongful act or omission of NYSE or any of its employees hereunder, except where such death, personal injury and/or damage is caused by the negligence or willful misconduct of AVGraphics or any of its employees or agents.

c) *Limitation of Liability*.  In no event shall either Party be liable to the other Party or to any third party for any consequential, indirect, special, incidental or punitive damages arising from or relating to this Agreement.

8.  *Confidentiality*.

a) *Definition*.  "Confidential Information" means:  (i) NYSE's or AVGraphics' know-how, trade secrets, proprietary, business and financial information, documents, designs, plans, reports, and studies, customer sales and marketing information, and prospective customer lists; (ii) information NYSE or AVGraphics identifies from time to time as confidential; (iii) information that should be treated as confidential under the circumstances surrounding its disclosure, including the contents of this Agreement and any Attachments or related agreements and any other oral or written communications between the Parties, (iv) all information received by AVGraphics from any NYSE Client in the course of performing Services for said Client, and (v) all information exchanged prior to the date of this Agreement with respect to the subject matter hereof.  For purposes of this Section 8, Confidential Information of any NYSE Client shall be deemed Confidential Information of NYSE.  Confidential Information shall not include: (i) information that becomes publicly known (other than through unauthorized disclosure), (ii) information rightfully obtained from a third party on a non-confidential basis; and (iii) information required to be disclosed by either Party pursuant to a subpoena or order of a court or regulatory or administrative body having jurisdiction over the Parties or the Services, provided, however, that the Party being required to disclose such information gives the other reasonable time to oppose such subpoena or court order and seek a protective order against such disclosure.

b) *Use and Maintenance of Confidential Information*.  Except as contemplated by this Agreement, neither NYSE nor AVGraphics shall disclose any Confidential Information of the other Party to any third party or use any Confidential Information of the other Party for its own benefit or the benefit of a third party, provided, however, that either Party may disclose Confidential Information of the other Party to its respective directors, officers, employees, agents and representatives (collectively, "Authorized Representatives") on a need-to-know basis solely in connection with fulfilling its obligations under this Agreement.  Each Party shall advise its Authorized Representatives of, and shall cause its Authorized Representatives to comply with, the terms of this Agreement applicable to Confidential Information with respect to any Confidential Information given to them and shall be responsible for any breach thereof by its Authorized Representatives.  Without limiting the generality of the foregoing, neither Party nor its Authorized Representatives shall engage in any securities transaction based on any Confidential Information of the other Party.  This Agreement does not grant AVGraphics or NYSE any proprietary rights in Confidential Information belonging to the other.

c) <u>*Notification*</u>. The Parties agree to immediately notify the other if it discovers any unauthorized use or disclosure of Confidential Information. The discovering Party shall cooperate with the other Party to regain possession of any wrongfully disclosed Confidential Information and prevent its further unauthorized use or dissemination.

d) <u>*Injunctive Relief*</u>. Each Party acknowledges that a breach of any of the covenants contained in this Section 8 may result in material irreparable injury to the other Party for which there is not an adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the aggrieved Party shall be entitled to seek a temporary restraining order and/or a preliminary or permanent injunction restraining the other(s) from engaging in activities prohibited or restricted by this Section 8 or such other relief as may be required to specifically enforce any of the covenants contained in this Section 8.

e) <u>*Return of Confidential Information*</u>. Each Party shall promptly return to its owner all Confidential Information, related records and all copies of Confidential Information upon request, and upon the expiration or earlier termination of this Agreement.

f) <u>*Survival*</u>. The obligations set forth in this Section 8 concerning Confidential Information survive the expiration or termination of this Agreement.

9. <u>*Intellectual Property*</u>.

a) <u>*Ownership of Intellectual Property*</u>. All materials including but not limited to all Audio/Visual presentations, graphic services, design, production, pictures, slides and software provided or developed under this Agreement shall be owned by NYSE free and clear of any liens, restrictions and encumbrances. To the extent that any of such materials are not deemed a "work for hire" by operation of law, AVGraphics hereby irrevocably assigns, transfers and conveys, and shall cause its agents to assign, transfer and convey to NYSE, without further consideration, all of its right, title and interest in and to such materials, including all rights of patent, copyright or other proprietary rights in such materials such that NYSE shall have all right, title and interest, including worldwide ownership of copyright and patent rights, in and to such materials and all copies and derivative works thereof.

b) <u>*Exclusions*</u>. Such materials shall not include pre-existing software code or other pre-existing materials owned by AVGraphics or licensed to AVGraphics by third parties including, without limitation, trade secrets and know-how, provided that prior to incorporating any of such materials into any work to be delivered to NYSE, AVGraphics shall identify such pre-existing materials to NYSE, and either (x) NYSE in its sole discretion shall consent in writing to the incorporation of any such materials or (y) AVGraphics shall prepare a versions of such work for NYSE that does not incorporate such materials. Subject to the foregoing, NYSE acknowledges that all of AVGraphics' right, title and interest, in such pre-existing software code

or other pre-existing materials, any and all derivative works thereof and all copies of the foregoing shall be and remain the exclusive property of AVGraphics subject to appropriate license rights of NYSE to applicable materials.

10. *Non-Solicitation*.

Each Party covenants and agrees that, during the Term of this Agreement    and for a period of one (1) year thereafter, it shall not solicit, recruit, hire or employ, or encourage any third party to solicit recruit, hire or employ, or assist any third party in soliciting, recruiting, hiring or employing, the Services of any of the other Party's officers or employees without the prior written consent of such other Party.

11. *Termination*.

a) *Termination of Agreement by NYSE*. NYSE may terminate this Agreement if NYSE is substantially in compliance with the terms of this Agreement and either:

   i)  All of the following occur:
       (1) AVGraphics breaches or fails to comply with the terms and conditions of this Agreement, and
       (2) NYSE gives AVGraphics written notice of such default specifying with particularity the nature of the breach or the failure to comply and
       (3) AVGraphics fails to cure the default within thirty (30) days after AVGraphics receives NYSE's notice of default, or if AVGraphics' breach cannot reasonably be cured within the thirty (30) days after AVGraphics receives the notice of default, AVGraphics fails to commence to cure the breach within the 30-day period or fails thereafter to diligently prosecute and complete the cure within sixty (60) days of the date AVGraphics receives NYSE's written notice of default;

or

   ii) Any one of the following occurs:
       (1) AVGraphics files a voluntary petition for bankruptcy;
       (2) AVGraphics does not obtain the dismissal of an involuntary petition for bankruptcy filed within sixty (60) days after the date of filing; or
       (3) AVGraphics makes an assignment for the benefit of its creditors, admits inability to pay obligations as they become due, and/or does not obtain the dismissal of the appointment of a receiver, manager or other similar custodian of AVGraphics' affairs within sixty (60) days.

b) *Termination of Agreement by AVGraphics*.    AVGraphics may terminate this Agreement if AVGraphics is substantially in compliance with the terms of this Agreement and either:

   i)  All of the following occur:

(1) NYSE breaches or fails to comply with the terms and conditions of this Agreement, and

(2) AVGraphics gives NYSE written notice of default specifying with particularity the nature of the breach or the failure to comply; and

(3) NYSE fails to cure the default within thirty (30) days after AVGraphics receives AVGraphics' notice of default, or if NYSE's breach cannot reasonably be cured within the thirty (30) days after NYSE receives the notice of default, then NYSE fails to commence to cure the breach within the 30-day period or fails thereafter to diligently prosecute and complete the cure within sixty (60) days of the date NYSE receives AVGraphics' written notice of default;

or

ii) Any one of the following occurs:

(1) NYSE files a voluntary petition for bankruptcy;

(2) NYSE does not obtain the dismissal of an involuntary petition for bankruptcy filed within sixty (60) days after the date of filing; or

(3) NYSE makes an assignment for the benefit of its creditors, admits inability to pay obligations as they become due, and/or does not obtain the dismissal of the appointment of a receiver, manager or other similar custodian of NYSE's affairs within sixty (60) days.

c) *Notice of Termination.* If one Party properly gives written notice of default to the other under Subsection 11(a) or 11(b), and the default is either not curable, or if curable, is not cured within the period provided, then by this Agreement such Party may give the other notice of termination of this Agreement, to be effective on the fifth (5th) day after delivery of the notice of termination to the defaulting Party, or on such later date as may be specified therein.

d) *Survival.* All rights and remedies of the Parties that exist prior to termination, or that arise out of obligations that by their nature survive termination, shall survive termination of this Agreement.

e) *Rights Cumulative.* The Parties' rights under this Section 11 are in addition to, and not in substitution of, all other remedies available to the Parties under this Agreement, at law, or in equity.

## 12. *Independent Contractors.*

The relationship of AVGraphics to NYSE shall be that of independent contractor and not of employee, agent, joint venture or partner. Except as may be expressly stated otherwise herein or in any Attachment hereto, AVGraphics, as an independent contractor, shall be free to choose the details of the manner in which AVGraphics shall perform the Services. AVGraphics agrees as an independent contractor to be solely responsible for all taxes attributable to the compensation received in connection with the Services. AVGraphics acknowledges and agrees

that neither AVGraphics nor any of its employees are entitled to workers' compensation or unemployment insurance benefits from NYSE and may only receive such coverage if provided by AVGraphics or some entity other than NYSE. Further, AVGraphics is obligated to pay federal and state income tax on any monies paid to AVGraphics pursuant to this Agreement. AVGraphics may, at AVGraphics own expense, employ such persons as AVGraphics deems necessary to assist in the performance of its Services hereunder. NYSE has no right to control, direct, or supervise AVGraphics assistants and/or employees in the performance of its obligations hereunder. AVGraphics assumes full and sole responsibility for the payment of all compensation and expenses of these assistants and/or employees and for all state and federal income tax, fringe benefits, insurance premiums, unemployment insurance, Social Security, disability insurance and other applicable withholdings.

13. *Miscellaneous.*

    a) *Governing Law.* This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without regard to principles of conflict of laws. The Parties to this Agreement hereby: (i) designate the state and federal courts sitting in New York City, New York, as the exclusive courts of proper jurisdiction and venue for any and all actions or proceedings relating to this Agreement; (ii) irrevocably consent to such designation, jurisdiction, and venue; and (iii) waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in any of such courts.

    b) *Binding Effect.* This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

    c) *No Conflicts.* NYSE represents and warrants that it is not a Party to any contract or agreement, the performance of which in accordance with its terms will result in a breach by NYSE of this Agreement. This Agreement has been duly executed and delivered by a duly authorized officer of NYSE.

    d) *Entire Agreement.* The Parties hereto agree that this Agreement, including the Attachments and Exhibits hereto, represents the complete and exclusive statement of the Agreement between the Parties, and supersedes all prior proposals and understandings, oral or written, relating to the subject matter of this Agreement.

    e) *Amendment.* This Agreement may be amended only by a written instrument when signed by the Parties hereto.

    f) *Interpretation.* This Agreement shall in all cases be construed as a whole according to its fair meaning, strictly neither for nor against any Party hereto, and without implying a presumption that the terms hereof shall be more strictly construed against one Party by reason of the rule of construction that a document

is to be construed more strictly against the Party who prepared the same, it being agreed that representatives of both Parties have participated in the preparation hereof.    In the event of any conflict between the terms of the body of this Agreement and any Attachment, Schedule or Exhibit hereto, the terms of the body of this Agreement shall control. The headings of the sections and paragraphs of this Agreement are inserted for convenience of reference only and shall not constitute a part hereof, nor affect the construction hereof.

g) _Confidential Terms_.  The terms of this Agreement are confidential and proprietary to the Parties hereto and shall not, without the prior written consent of the other Party hereto, be disclosed or provided to any third Party by either Party hereto.

h) _Counterparts_.   This Agreement may be executed in one or more original or facsimile counterparts, each of which shall be deemed an original and all of which shall be considered one and the same Agreement.

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written.

NEW YORK STOCK EXCHANGE, INC.

By: _____
    Name:  CATHERINE KINNEY
    Title:  PRESIDENT & CO-COO

By: _____
    Name:  Margaret Tutwiler
    Title: EVP, External Affairs

AVGRAPHICS, INC.

By: _____
    Name: JP Azoulay
    Title: President

**Exhibit B**

Margaret DeB. Tutwiler
*Executive Vice President*
*Communications and Government Relations*

New York Stock Exchange, Inc.
11 Wall Street
New York, NY 10005

tel: 212.656.4351
fax: 212.656.4355
mtutwiler@nyse.com

# ■ NYSE

January 1, 2007

AVGraphics, Inc.

Re:    Renewal of Statement of Work for Audio Visual and Graphic Design Services
dated January 1, 2005 between AVGraphics, Inc. and New York
Stock Exchange, Inc. ("NYSE"), predecessor-in-interest to NYSE Group, Inc.

Ladies and Gentlemen:

This letter agreement confirms our mutual agreement that:

1. NYSE Group, Inc. ("NYSEG") is the assignee of, and successor-in-interest to, NYSE with respect to the Audio Visual and Graphics Services Agreement, dated January 1, 2005 ("AV Agreement") and the Statement of Work for Audio Visual and Graphic Design Services dated January 1, 2005, entered unto pursuant to AV Agreement ("SOW"), and that NYSEG is deemed a party to the AV Agreement and SOW as if an original party thereto.

2. Notwithstanding the provisions of Section 2(a) of the AV Agreement, the AV Agreement and the SOW are extended through February 28, 2007, and shall continue in effect thereafter until terminated by no less than thirty (30) day's notice of termination from either party to the other;

3. the transfer of any portion of the capital stock of AV Graphics to Jean-Pierre Azoulay shall be a material breach of the AV Agreement which, without prejudice to any other remedies of NYSEG, shall entitle NYSEG to terminate the AV Agreement and the SOW upon notice.

Except as set forth in this letter agreement, the AV Agreement and SOW remain in full force and effect.

Very truly yours,

NYSE Group, Inc.

By: _____
       Name:
       Title:

ACCEPTED AND AGREED:

AVGraphics, Inc.

By: _____
Name:
Title:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVGRAPHICS, INC., JEAN PIERRE AZOULAY AND DARIA MCDERMOTT,

Plaintiff,

- against -

NYSE GROUP, INC., et al,

Defendants.

AMENDED SUMMONS AND FIRST AMENDED COMPLAINT

Cronin & Byczek, LLP
1983 Marcus Avenue
Suite C-120
Lake Success, New York  11042

(516) 358-1700

*To:*

*Attorney(s) for*

*Service of a copy of the within*                                    *is hereby admitted.*

*Dated:*

...............................................................

*Attorney(s) for*

*PLEASE TAKE NOTICE*

☐  *that the within is a (certified) true copy of a*
NOTICE OF   *entered in the office of the clerk of the within named Court on*                    20
ENTRY

☐  *that an Order of which the within is a true copy will be presented for settlement to the Hon.*
NOTICE OF        *one of the judges of the within named Court,*
SETTLEMENT  *at*
*on*                    20        *, at*              *M.*

*Dated:*

Cronin & Byczek, LLP
1983 Marcus Avenue
Suite C-120
Lake Success, New York  11042

*To:*

*Attorney(s) for*

N912 CL